# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

IN RE:

JOGI PACK & SHIP SERVICES, LLC,

Debtor.

_____/

CASE NO.: 3:22-00809
CHAPTER 11

## THE UPS STORE, INC.'S (I) OBECTION TO DEBTOR-IN-POSSESSION'S MOTION FOR TURNOVER AND (II) CROSS-MOTION TO CONVERT CASE TO CHAPTER 7

The UPS Store, Inc. ("TUPSS") submits this objection (the "Objection") to *Debtor-In-Possession's Motion for Turnover* [Docket No. 182] (the "Turnover Motion") and hereby moves (the "Cross Motion"), pursuant to section 1112(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), and Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to convert the above-captioned chapter 11 case (the "Chapter 11 Case") to a chapter 7 case for cause. In support of this Cross Motion, TUPSS relies upon the: (i) *Declaration of John Turley in Support of the Objection of The UPS Store, Inc. to Debtor's Motion To Assume the Franchise Agreement with The UPS Store, Inc.* [Docket No. 65] (the "Turley Decl."); (ii) *Declaration of Jarod Kilefner in Support of the Objection of The UPS Store, Inc. to Debtor's Motion To Assume the Franchise Agreement with The UPS Store, Inc.* [Docket No. 66] (the "Kilefner Decl."); and (iii) *Declaration of Mark R. McDonald in Support of the Objection of The UPS Store, Inc. to Debtor's Motion To Assume the Franchise Agreement with The UPS Store, Inc.* [Docket No. 67] (the "McDonald Decl.") previously filed in this Chapter 11 Case and incorporated herein by reference, and all the prior pleadings, hearings, and orders entered in this Chapter 11 Case, and respectfully states as follows:

## PRELIMINARY STATEMENT[1]

1.  Five weeks ago, TUPSS was before this Court requesting the extreme relief of removing the Debtor as debtor in possession in this Chapter 11 Case after he had failed to close the Court-approved sale of the Debtor's business for over a month past the deadline to do so pursuant to the Debtor's Court-approved settlement agreement with TUPSS (the "<u>Settlement Agreement</u>"). After this Court granted the motion in part, the Debtor finally closed the sale; only to then file the Turnover Motion, in which the Debtor—which freely admits that it is administratively insolvent and shall never confirm a plan—asks this Court to force TUPSS to fund alleged administrative expenses, many of which are undocumented and unsupported. However, TUPSS never agreed to fund the administrative expenses of the estate, and the Debtor can point to no provision of the Settlement Agreement that says otherwise.

2.  What TUPSS did do was refrain from objecting to the Debtor's use of TUPSS's cash collateral to fund administrative expenses of the estate. In TUPSS's view, the Debtor had abundant cash on hand in its operating account, together with ongoing revenues, to fund the administrative expenses of this Chapter 11 Case through a sale, and still have cash left over to distribute to TUPSS. And, prior to filing the Turnover Motion, the Debtor never claimed otherwise. That the Debtor now appears to have somehow exhausted all of TUPSS's cash collateral without paying its administrative expenses is due entirely to the Debtor's mismanagement or worse. It is not TUPSS's responsibility or fault.

3.  In the Turnover Motion, the Debtor asserts that it is entitled to force TUPSS to turnover PRP to the Debtor so that the Debtor can selectively use it to pay non-TUPSS

---

[1] Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed to them in the remainder of this Cross Motion.

administrative expenses. Not so. Under the terms of the Settlement Agreement, the Debtor agreed to continue to pay its ongoing obligations to TUPSS under the terms of the Franchise Agreement. And, under the Franchise Agreement, TUPSS is expressly entitled to offset the PRP against amounts owed by the Debtor to TUPSS. That is what TUPSS has done. The Turnover Motion should be denied.

4. In addition, given the extreme leakage of the Debtor's cash—in manners that have at times been either questionable or inappropriate on their face—TUPSS cross-moves to convert this case to chapter 7. The Debtor has conceded that there is no path to a confirmable plan and that it just wants to dismiss the Chapter 11 Case after squeezing some more money out of TUPSS, which has already suffered a significant loss and has come nowhere close to recovering its $950,000 allowed secured claim. TUPSS submits that "cause" exists to convert the case to Chapter 7 so that a Chapter 7 trustee can investigate and prosecute claims against the Debtor's principal in order to maximize the value of the Debtor's estate for TUPSS and other creditors, including unpaid administrative creditors and the U.S. Small Business Administration ("SBA").

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the Cross-Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

6. The statutory bases for the relief requested here is Section 1112(b) of the Bankruptcy Code and Bankruptcy Rules 1017 and 9014.

## BACKGROUND

**A.      Prepetition Relationship of TUPSS and the Debtor**

7. On October 23, 2018, Divyan Patel executed a franchise agreement (the "Franchise Agreement") on behalf of the Debtor, which TUPSS countersigned on or about November 7, 2018.

3

*See Debtor's Motion To Assume the Franchise Agreement with The UPS Store, Inc.* [Docket No. 47] Ex. A (*Franchise Agreement*). Pursuant to the Franchise Agreement, TUPSS granted the Debtor a franchise to operate a The UPS Store® Center, Center Number 6113 (the "Center"), located at 52 Tucson Way, Suite 202, Saint Augustine, Florida 32092. *See id.* In order to secure the Debtor's obligations to TUPSS, the Debtor and TUPSS entered into a security agreement, under which the Debtor granted TUPSS a first priority security interest in all of the Debtor's assets, including cash, accounts, accounts receivable, and deposits. *See* Franchise Agreement, Ex. F.

8. As set forth in greater detail in the *Motion of the UPS Store, Inc. for a Comfort Order Pursuant to Section 362(j) of the Bankruptcy Code To Confirm that the Automatic Stay Does Not Apply as to its Franchise Agreement and that The UPS Store, Inc. May Exercise and Enforce its Post-Termination Rights Under the Franchise Agreement or, in the Alternative, for Relief from the Automatic Stay To Exercise its Rights Under the Franchise Agreement, Including To Terminate the Franchise Agreement and To Exercise and Enforce its Post-Termination Rights* [Docket No. 80] (the "TUPSS Lift Stay Motion"), the Turley Decl., the Kilefner Decl., and the McDonald Decl., prior to the Petition Date (as defined herein), after a thorough investigation, TUPSS determined that the Debtor's billing for Amazon and A&T return packages was improper, fraudulent, and grossly overstated—by close to $1,000,000. On April 21, 2022, TUPSS sent the Debtor a Notice of Termination, which provided that the Franchise Agreement "will terminate thirty (30) days after this letter's delivery to you unless, prior to such time, you sign and return the enclosed Mutual Termination Agreement ('MTA')[.]" McDonald Decl., Ex. A. The Debtor did not sign and return the MTA. *See* McDonald Decl. ¶ 5.

B.     **The Debtor's Bankruptcy Case**

9. On April 22, 2022 (the "Petition Date"), the Debtor commenced this bankruptcy case by filing its voluntary petition under chapter 11 of the Bankruptcy Code [Docket No. 1].

10. On May 6, 2022, the Debtor filed its Schedules [Docket No. 24] (the "Schedules"), which it later amended on May 17, 2022 [Docket No. 40]. According to the Schedules, the Debtor had ***$135,154.95 cash*** on hand on the Petition Date. In addition, the Debtor disclosed that, in the year prior to the Petition Date, the Debtor had distributed approximately ***$215,000 to principal Divyan Patel*** in salary and distributions, along with having distributed approximately ***$40,000 in distributions to his wife, Bijal Patel***.

11. On May 25, 2022, the Office of the United States Trustee (the "U.S. Trustee") held the Section 341 Meeting of Creditors (the "341 Meeting"). In connection therewith, the Debtor claimed that the business was profitable and financially healthy and that its only issue was its business dispute with TUPSS. *See* Transcript of 341 Meeting at 21:6-9, *In re Jogi Pack & Ship Servcs., LLC*, No. 22-bk-00809-BAJ (Bankr. M.D. Fla. May 25, 2022).

12. On June 13, 2022, the Debtor amended its petition to elect to proceed under chapter 11, subchapter V [Docket No. 50]. On June 14, 2022, Mr. Robert Altman was appointed as the subchapter V trustee (the "Subchapter V Trustee") in this case [Docket No. 53].

13. On June 30, 2022, TUPSS filed its secured claim against the Debtor for over $1,000,000 due and owing under the terms of the Franchise Agreement.

C. **The Debtor's Inappropriate and Unsubstantiated Payments**

14. On May 23, 2022, the Debtor filed its *Monthly Operating Report for Small Business Under Chapter 11* for April 2022 [Docket No. 45]. Attached to that report was a bank account statement which showed that, ***on the Petition Date***, the Debtor wrote a check to the principal's wife, Bijal Patel, in the amount of ***$5,000***, and a check to principal Divyan Patel in the amount of ***$3,000***—both with a reference to "savings." The Debtor also made a wire transfer in the amount of ***$31,738*** to an unidentified recipient.

15. Subsequent *Monthly Operating Reports for Small Business* for May 2022 [Docket No. 57], June 2022 [Docket No. 72], July 2022 [Docket No. 107], and August 2022 [Docket No. 136] attached bank account statements that showed additional payments that were either inappropriate on their face or questionable at best. In particular, the Debtor transferred a total of **$6,753** to BAPS Swaminaraya, which is a religious institution,[2] and **$1,050** to "GeoTarget" for the benefit of a Cold Stone Creamery.[3] In addition, the Debtor transferred an astounding **$109,137.94** to a personal American Express account.[4] When asked to produce statements to support what was purchased with that $109,137.94 of estate funds, the Debtor claimed to have no copies of any such statements, nor the ability to access or obtain any such statements.

D.      **The Debtor's Settlement Agreement with TUPSS**

16. On August 8, 2022, TUPSS filed the TUPSS Lift Stay Motion. On August 15, 2022, the Debtor filed an objection to the TUPSS Lift Stay Motion [Docket No. 84]. As a result of good-faith, arms-length negotiations, the parties entered into a settlement agreement on August 31, 2022 (the "Settlement Agreement"). *See Debtor's Motion Pursuant to Fed. R. Bankr. P. 9019 for Order Approving Compromise and Settlement Agreement Between Debtor and the UPS Store, Inc.* [Docket No. 104] (the "Settlement Motion"). On September 27, 2022, the Court entered an order granting the Settlement Motion [Docket No. 122].

---

[2] A chart listing payments to BAPS Swaminaraya, which were reflected on the bank account statements attached to the Monthly Operating Reports, is attached hereto as **Exhibit A**.

[3] A chart listing payments to "GeoTarget" for the benefit of a Cold Stone Creamery, which were reflected on the bank account statements attached to the Monthly Operating Reports, is attached hereto as **Exhibit B**.

[4] A chart listing payments to Divyan Patel's personal American Express account, which were reflected on the bank account statements attached to the Monthly Operating Reports, is attached hereto as **Exhibit C**.

17. Under the Settlement Agreement, the Debtor agreed to stipulate to the immediate granting of TUPSS's Lift Stay Motion, and TUPSS agreed that, if the Debtor obtained a signed purchase and sale agreement that was acceptable to TUPSS within a specified time frame, then TUPSS would defer exercising its rights under the Franchise Agreement for 60 days to allow time for the transaction to close. *See* Settlement Agreement § 3(i) and 3(iv). Meanwhile, pursuant to Section 3(xii) of the Settlement Agreement, the Debtor agreed to operate the Center in full compliance with the Franchise Agreement, including paying to TUPSS all applicable fees and royalties. In addition, post-termination obligations under the Franchise Agreement were explicitly carved out of the releases contemplated in Section 3(ix) of the Settlement Agreement. Under Section 17.1 of the Franchise Agreement, Franchisee is obligated to indemnify and reimburse TUPSS for all losses, including attorneys' fees, "based upon, arising out of, or in any way related to the operation of the Center, Franchisee's acts or omissions . . ., or the breach by Franchisee of any provision of this Agreement." And, by its terms, Section 17.1 survives termination of the Franchise Agreement.

18. On September 6, 2022, the Court entered the *Order Granting Motion of the UPS Store, Inc. for a Comfort Order Pursuant to Section 362(j) of the Bankruptcy Code To Confirm that the Automatic Stay Does Not Apply as to its Franchise Agreement and that The UPS Store, Inc. May Exercise and Enforce its Post-Termination Rights Under the Franchise Agreement or, in the Alternative, for Relief from the Automatic Stay To Exercise its Rights Under the Franchise Agreement, Including To Terminate the Franchise Agreement and To Exercise and Enforce its Post-Termination Rights* [Docket No. 109] (the "<u>Lift Stay Order</u>"). Under the terms of the Lift Stay Motion, TUPSS was granted "relief from the automatic stay to exercise its rights under the Franchise Agreement, including its rights to terminate the Franchise Agreement and to exercise

and enforce its post-termination rights and remedies under the Franchise Agreement without violating the automatic stay." *Id.* On September 27, 2022, the Court entered an order granting the Settlement Motion [Docket No. 122].

19. On November 6, 2022, the Debtor signed an asset purchase agreement with Ms. Kathy Lynn. In connection therewith, Debtor's counsel requested assurance from TUPSS's counsel that TUPSS would not object to the payment of the fees of the Debtor's counsel and the fees of the Sub-Chapter V Trustee. In response, TUPSS's counsel stated:

> Provided that the sale to the Lynns is closed, TUPPS has no objection to administrative expenses being paid from the Debtor's bank accounts up to a cap of $50,000. TUPPS would also like some assurance that amounts in the Debtor's bank account above $50,000 will not disappear.[5]

20. On November 16, 2022, the Debtor filed the *Debtor's Motion for Entry of an Order Approving the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests to Kathy Lynn* [Docket No. 139] (the "Sale Motion"). In the Sale Motion, the Debtor described the accommodation reached with TUPSS thusly:

> Administrative expenses payable to the Debtor's attorneys and the Subchapter V Trustee will be paid ***out of the Debtor's operating account*** in the ordinary course of business. The additional fees and costs payable to Debtor's counsel from July 1, 2022 through the closure of this case will be capped at $50,000.00, and the additional fees and costs payable to the Sub-Chapter V Trustee will be capped at $5,200.00.

*See* Sale Motion ¶ 18 (emphasis added). On December 21, 2022, the Court entered an order granting the Sale Motion [Docket No. 156].

---

[5] *See* November 5, 2022 email from TUPSS's counsel to Debtor's counsel, attached hereto as **Exhibit D**.

8

21. Unfortunately, following the execution of the Settlement Agreement, the amount of cash in the Debtor's operating account that was to be available to fund administrative expenses started upon a steady decline—despite the fact that, every month, the Debtor's *Monthly Operating Report for Small Business Under Chapter 11* stated that it was projected that the business operations would be net cash positive by $7,000 or $8,000 the next month. Indeed, in the summer, the bank account balance had reached nearly $90,000 before diminishing to $28,000 by the end of December—the busiest (and most profitable) month of the year for a The UPS Store franchise.

|  | Total Opening Balance of all Accounts | Total End Balance of all Accounts |
|---|---|---|
| April 2022 MOR [DI 45] | $67,000.31 | $130,155.26 |
| May 2022 MOR [DI 57] | $60,000.31 | $84,358.89 |
| June 2022 MOR [DI 72] | $84,358.89 | $85,283.83 |
| July 2022 MOR [DI 107] | $88,261.48 | $86,843.47 |
| August 2022 MOR [DI 136] | $83,827.12 | $80,206.57 |
| September 2022 MOR [DI 137] | $70,064.22 | $63,225.36 |
| October 2022 MOR [DI 146] | $66,158.01 | $66,063.87 |
| November 2022 MOR [DI 160] | $68,971.52 | $45,344.41 |
| December 2022 MOR [DI 169] | $45,344.41 | $28,045.85 |

22. At the same time, the amount of cash deposits making their way into the operating account decreased from over *$15,000* at the beginning of the bankruptcy to being *de minimis* after entry into the Settlement Agreement. In fact, it looks as if the Debtor just stopped accepting cash payments from customers. Judging by the amounts that actually made it into the Debtor's

9

operating account, the Debtor collected less than $550 in cash from customers during the peak holiday season months of November and December of 2022.[6]

23.  Moreover, following the entry into the Settlement Agreement, the amounts of certain wire transfers—which TUPSS had understood from Debtor's counsel to represent bi-weekly payroll expenses—increased steadily every month despite the Debtor reporting on its *Monthly Operating Reports* that its number of employees had declined from seven on the Petition Date to six in July, and that the employee count remained at six through the end of the year. For instance, the wire transfers that TUPSS understood to be for payroll totaled approximately **$17,500** in May (representing two payrolls) and approximately **$30,875** in June (representing three payrolls). In contrast, the wire transfers that we understood to be for payroll totaled approximately **$38,820** in November (representing three payrolls) and approximately **$43,175** (representing two bi-weekly payroll periods) in December. Thus, the Debtor's two-month payroll costs nearly **doubled** from approximately **$48,375** to approximately **$82,000**. In order to understand this phenomenon, TUPSS asked the Debtor to produce a list of employees and the salary being paid to each, but the Debtor has not responded to the request.

24.  On February 13, 2023, TUPSS filed the *Motion of the UPS Store, Inc. to Remove the Debtor in Possession and Request for Expedited Hearing* [Docket No. 170], which the Court granted in part on February 15, 2023 [Docket No. 174] (the "Removal Order"). Pursuant to the Removal Order, if the Debtor did not properly execute any and all appropriate documents required to enable the sale and deliver those documents to the estate-retained professional broker by 3:00 p.m. (ET) on February 15, 2023, then the Debtor would have been removed as debtor in

---

[6] A chart listing deposits, as reflected on the bank account statements attached to the Monthly Operating Reports, is attached hereto as **Exhibit E**.

possession under Section 1185(a) of the Bankruptcy Code. *See* Removal Order ¶ 2. On February 24, 2023, the Debtor filed the *Report of Sale* [Docket No. 180], which stated that the sale closing occurred on February 15, 2023.

25.     On March 2, 2023, the Debtor filed the Turnover Motion, asking the Court to force TUPSS to turnover to the Debtor's estate approximately $30,000 in "program revenue payments" ("PRP"), which TUPSS is setting off against amounts that the Debtor owes to TUPSS under the Franchise Agreement. Under the Settlement Agreement, because the sale of the Debtor's business did not close by the Sale Agreement Milestone date of January 6, 2023, TUPSS became entitled to exercise its rights to setoff under the Franchise Agreement and the Lift Stay Order. In the Turnover Motion, without providing any sort of accounting for what has become of the cash that sat in its operating account, or the revenue that it has been collecting, the Debtor represents that it needs the approximately $30,000 in PRP to pay the following roughly $46,000 in expenses:

 a. Remaining fees owed to Mr. Altman, the Subchapter V Trustee: $592.93[7]

 b. Remaining attorneys' fees owed to Debtor's counsel pursuant to the agreement with TUPSS: $7,500.00[8]

 c. Remaining employee wages: $2,800.00 (approximate)

 d. Royalties owed to TUPSS for January 2023: $6,900.00 (approximate)[9]

---

[7] In light of Mr. Altman's services in this Chapter 11 case, TUPSS would be willing to refrain from setting off and releasing to Mr. Altman the remaining fees owed to Mr. Altman. However, TUPSS is not willing to put an additional $30,000 into the hands of this Debtor.

[8] As explained above, the agreement with TUPSS was ***not*** that TUPSS would pay this amount to Debtor's counsel. The agreement was that TUPSS would not object to that amount being paid to Debtor's counsel ***from TUPSS's cash collateral in the Debtor's operating account***. TUPSS had no intention of bearing the risk that the Debtor would dissipate that cash without paying its own counsel.

[9] While the Debtor proposes to pay royalties owed to TUPSS for January 2023, the Debtor does not propose to pay other amounts that the Debtor owes to TUPSS, including royalties owed to

  e. Utilities bill owed to Florida Power & Light: $388.00

  f. Internet/phone bill owed to Comcast: $278.00

  g. Postage bill owed to Pitney Bowes: $788.00

  h. Copier charges for copies made: $488.00

  i. Officer salary payable to Divyan Patel for the second half of January and first half of February: $7,000.00

  j. Demand amount from landlord for lease assignment fee: $1,000.00

  k. Amounts owed to American Express for post-petition charges: $19,000 (approximate)

Turnover Motion ¶ 9. Based upon a subsequent correction filed by the Debtor, at least the amount of the Comcast bill apparently was already paid at the time that the Turnover Motion was filed. *See Debtor-In-Possession's Supplement (Corrective) to Motion for Turnover (ECF No. 182)* [Docket No. 187]. TUPSS's requests for a written statement from American Express to substantiate the alleged $19,000 in post-petition American Express charges were refused.

## I. REPLY

  **A.** **TUPSS is Entitled to Set Off and Recoup the PRP**

  26. Section 553(a) of the Bankruptcy Code preserves a creditor's right to offset mutual debts. 11 U.S.C. § 553(a). *See also Brook v. Chase Bank USA, N.A. (In re Acosta-Garriga)*, 566 Fed. Appx. 787, 789 (11th Cir. 2014) ("Set off under Section 553 is the right to cancel out mutual debts against one another in full or in part to avoid the absurdity of making A pay B when B owes A." (internal citations and quotations omitted)); *In re Giles*, 271 B.R. 903, 906 (Bankr. M.D. Fla. 2002) ("The right to setoff is recognized and protected under Bankruptcy Code

---

TUPSS for the first two weeks of February 2023, and other fees, expense reimbursement, and indemnification owed to TUPSS under the terms of the Franchise Agreement.

section 553[.]"). Here, pursuant to Section 5.7 of the Franchise Agreement, TUPSS is entitled to offset the PRP against any amounts owed to TUPSS under the Franchise Agreement. *See* Franchise Agreement § 5.7 (If Franchisee (or any Affiliate of Franchisee) owes any monies to TUPSS (or to any Affiliate of TUPSS), TUPSS shall have the absolute and unconditional right to first deduct any or all of such amounts from any payments of monies owed by TUPSS (or owed by any Affiliate of TUPSS) to Franchisee (or to any Affiliate of Franchisee).). While the exercise of a right of setoff against a chapter 11 debtor requires relief from the stay, TUPSS already obtained relief from the stay to exercise all of its rights under the Franchise Agreement. *See* Lift Stay Order ¶ 2. TUPSS has now exercised that right as it was entitled to do.

27. In addition, not only does the Franchise Agreement grant TUPSS a contractual right to setoff, TUPSS also has the equitable right of recoupment to apply the PRP to amounts owed to TUPSS because the PRP and the obligations owed to TUPSS both arise from the Franchise Agreement. *See Advanced Telecommc'n Network, Inc. v. Allen (In re Advanced Telecommc'n Network, Inc.)*, No. 6:03-ap-122-KSJ, 2010 WL 273428, at *5 (Bankr. M.D. Fla. Jan. 15, 2010) ("Recoupment differs [from setoff] only insofar as the opposing claims must arise from the same transaction. . . . Recoupment is not specifically addressed in the Bankruptcy Code, but is generally allowed."); *Affiliated of Fla., Inc. v. Mt. Olive Pickle Co. (In re Affiliated of Fla., Inc.)*, 258 B.R. 495, 499 (Bankr. M.D. Fla. 2000) ("[Recoupment] should be limited in bankruptcy cases to situations in which both debts arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations.").

28. The Debtor does not and cannot seriously deny that TUPSS has setoff and recoupment rights to apply the PRP to amounts owed to TUPSS. Indeed, at the last Court hearing

in this Chapter 11 Case, the ***Debtor's counsel himself*** suggested to the Court that TUPSS could withhold and offset from future PRP amounts still owed to TUPSS:

> And my understanding, as well, is that the Debtor is entitled to certain monies that should be remitted by Tups [sic] post closing. And I understand at the end of the day some of this money will be flowing back to Tups to any event. . . . If it cannot halt closing, then I think it would make sense for the UPS Store to take it out of any money that should be remitted to the Debtor in the ordinary course of business.

Transcript of Hearing at 8:5–9 and 8:16–20, *In re Jogi Pack & Ship Servcs., LLC*, No. 22-bk-00809-BAJ (Bankr. M.D. Fla. Feb. 14, 2023).

29. Because TUPSS is entitled to setoff and recoup the PRP, the Turnover Motion should be denied.

## II. MOTION TO CONVERT CASE TO CHAPTER 7

30. Pursuant to section 1112(b) of the Bankruptcy Code, the Court shall dismiss or convert a Chapter 11 case to a Chapter 7 case for "cause." 11 U.S.C. § 1112(b)(1). Examples of "cause" included in Section 1112(b)(4) include "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," and "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4). Both those examples are present here.

31. <u>First</u>, if the Debtor's statements in its Turnover Motion are to be believed, the Debtor's estate is hopelessly administratively insolvent. By the Debtor's own accounting of its administrative expenses—even ignoring the vast majority of the Debtor's obligations owed to TUPSS (which is what the Debtor's list of expenses does ignore)—the Debtor has far more debt than the Debtor could pay even if the Turnover Motion were granted. *See* Turnover Motion ¶¶ 8–9 (requesting $30,000 in PRP to pay approximately $46,000 in expenses). Administrative insolvency is ample "cause" to satisfy the "substantial or continuing loss to or diminution of the

estate" requirement for conversion or dismissal. *See In re 412 Boardwalk, Inc.*, 520 B.R. 126, 135 (Bankr. M.D. Fla. 2014) ("Negative cash flow and an inability to pay current expenses as they come due can satisfy the continuing loss to or diminution of the estate standard for purposes of § 1112(b).") (citation omitted).

32. Second, there is no hope of rehabilitation or confirming a Chapter 11 plan. In fact, the Debtor freely admits that the Debtor intends to dismiss the case and can never confirm a plan. *See Consent Motion to Continue March 22, 2023 Confirmation Hearing* [Docket No. 184], ¶ 3 ("[T]here are insufficient funds to provide a distribution to unsecured creditors. For that reason, the Debtor expects to file a motion to dismiss this case."). This inability to confirm a plan also constitutes "cause" to convert or dismiss. *See In re Baker*, No. 3:12-BK-4178-PMG, 2013 WL 12461143, at *3 (Bankr. M.D. Fla. Jan. 11, 2013) ("Dismissal under Section 1112(b)(2) is appropriate when a court determines that it is unreasonable to expect that a plan can be confirmed within a reasonable amount of time." (citing *In re Lezdey*, 332 B.R. 217, 222 (Bankr. M.D. Fla. 2005))); *see also Pegasus Wireless Corp. v. Tsao (In re Pegasus Wireless Corp.)*, 391 Fed. Appx. 802, 803 (11th Cir. 2010) ("Dismissal is particularly appropriate when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." (internal quotations and citation omitted)). Indeed, this Court has noted that, "in analyzing whether there is an absence of reasonable likelihood of rehabilitation, the focus is not on the technical issue of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *In re Basil St. Partners, LLC*, 477 B.R. 856, 862 (Bankr. M.D. Fla. 2012) (internal quotations and citation omitted). Here, the answer is clearly no.

33. <u>Finally</u>, to the extent that there are unpaid creditors here, including administrative creditors and the SBA, a chapter 7 trustee could pursue estate claims to provide a source of recovery. *See In re No Rust Rebar, Inc.*, 641 B.R. 412, 423 (Bankr. S.D. Fla. 2022) ("In addition to the causes provided under § 1112(b)(4) . . . bankruptcy courts have frequently identified other factors that support a finding of cause, including where the debtor in possession has a conflict of interest in properly investigating and pursuing potential fraudulent transfers and other claims of the estate." (internal quotations and citation omitted)). According to the Schedules, the Debtor's principal and his wife received $250,000 in dividends and salary in the year prior to the Petition Date, ***including a $5,000 check cut to the principal's wife on the Petition Date.*** The ***$6,753*** transferred post-petition to the Debtor's principal's house of worship is likely subject to clawback, as well. Not to mention the number of mysterious payments and oddities that are deserving of further investigation and could give rise to further claims, including the approximately ***$109,000*** in payments to the Debtor's principal's personal American Express card, the ***near doubling*** of the Debtor's payroll without disclosing the names of the recipients and amounts transferred to each, and the fact that the Debtor appears to have stopped accepting cash payments from customers in the middle of the Chapter 11 Case.

34. Accordingly, a Chapter 7 trustee should be appointed to take charge of whatever remains of the Debtor's cash and other assets and to investigate estate claims against the Debtor's principal and his wife.

## **CONCLUSION**

35. For the foregoing reasons, TUPSS respectfully requests that the Court enter an order providing the following relief:

(a) denying the Turnover Motion;

(b)	granting the Cross Motion;

(c)	converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code pursuant to 11 U.S.C. § 1112;

(d)	directing the U.S. Trustee to select and to seek appointment of a Chapter 7 Trustee expeditiously; and

(e)	granting such other and further relief as this Court deems just and proper.

Dated: March 20, 2023
Tampa, Florida

Respectfully submitted,

By: /s/ Noel Boeke
Noel Boeke (Fla. Bar. No. 151830)
HOLLAND & KNIGHT LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602
Telephone: (813) 227-6525
Facsimile: (813) 314-5146
noel.boeke@hklaw.com

-and-

Mark R. McDonald (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA 90017-3543
Telephone: (213) 892-5200
Facsimile: (213) 892-5454
mmcdonald@mofo.com

Theresa A. Foudy (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019-9601
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
tfoudy@mofo.com

*Counsel to The UPS Store, Inc.*